UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UTILITY CONTRACTORS ASS'N OF NEW ENGLAND, INC., W. WALSH COMPANY, INC., I.W. HARDING CONSTRUCTION, INC., and DENNIS DUGAN,<br>    Plaintiffs,<br><br>    v.<br><br>CITY OF WORCESTER,<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil No. 02-11877-NG<br>)<br>)<br>) |

GERTNER, D.J.:

## MEMORANDUM AND ORDER
September 16, 2003

The Privileges and Immunities Clause of the United States Constitution, U.S. Const. art. IV, § 2, secures to the nation's citizens the right to compete for work in any of the several states, regardless of their state of residence.  The Framers of the Constitution devised this protection "to ensure that the newly created Union did not revert to its component parts because of interstate jealousies and insular tendencies." Sup. Ct. of New Hampshire v. Piper, 470 U.S. 274, 290-91 (1985).

As a result, a state or municipality that passes legislation discriminating against out-of-state workers must be prepared to justify its actions before a federal court.  The law is very strict, perhaps more than is warranted today, two hundred years after the Framers agonized over how best to draw a nation's strength from a loose federation of former colonies.  But the law holds fast, not in spite of the nation's unity, but because of

it:  the mere fact that a state or locality is less well-off than its neighbors will not afford it license to pass laws that discriminate against outsiders in pursuit of their livelihoods.

Accordingly, on December 23, 2002, a preliminary injunction entered in this case, suspending the City of Worcester's (the "City") fifty-percent Worcester-resident work hours requirement of employers contracting or subcontracting with the City to complete public works projects.  The City had described desperate economic conditions in Worcester and indicated that the residency requirement meant to alleviate unemployment in the city.  This was not enough to prevent the entry of the preliminary injunction.  The parties now move for summary judgment, on a record substantially the same as was before the Court eight months ago.

For the reasons set forth below, the plaintiffs' motion for summary judgment [document #34] is **GRANTED IN PART AND DENIED IN PART**, and the City's cross-motion [document #46] is **GRANTED IN PART AND DENIED IN PART**.

I.   <u>**FACTS/PROCEDURAL HISTORY**</u>

The following facts are established for purposes of summary judgment:

Chapter 2, Section 32 of the City of Worcester's Revised Ordinances sets forth a residency requirement for employment on

municipal public works projects in Worcester.  This Residency

Requirement Ordinance ("RRO") was enacted in 1984 and provides as

follows:

>        On any project for the construction,
> reconstruction, installation, demolition,
> maintenance or repair of any building, or
> public work, costing in excess of twenty-five
> thousand dollars, to be funded in whole or in
> part by city funds, or funds which, in
> accordance with a federal or state grant,
> program, or otherwise, the city expends or
> administers, . . . the provisions of this
> section shall apply and the same shall be
> referenced in every invitation to bid for
> such project and[] the following paragraphs
> shall be contained in every resulting
> contract therefrom:
>
> It shall be a material breach of this
> contract if the contractor and each
> subcontractor on a craft-by-craft basis shall
> not at all times provide at least fifty
> percent of the total employee workerhours in
> each trade, at every tier, to be performed by
> bona fide residents of the city of Worcester.
> The contractor shall include such
> requirements and provide reference to this §
> 32 of chapter two of the Revised Ordinances
> of the city, in each subcontract entered into
> by him and shall require each subcontractor
> to include the same in all subcontracts at
> all tiers.  For purposes of this paragraph,
> work performed by persons filling
> apprenticeships and on-the-job training
> positions shall be included.

A 1997 enactment, called the "Responsible Employer

Ordinance," ("REO") outlines the range of penalties that the City

may visit upon employers for noncompliance with, among other

ordinances, the RRO.  The REO entitles the City (1) to suspend

the employer's work on the project pending its compliance, (2) to

withhold payment until the employer demonstrates compliance, (3) to discharge the employer permanently from the project, and (4) to assess liquidated damages for each week the employer is determined to be out of compliance.  Revised Ordinances of the City of Worcester, c. 2, § 35(d).

Plaintiff Utility Contractors Association of New England, Inc. ("UCANE") is a nonprofit corporation organized under the laws of Massachusetts.  UCANE represents the interests of over 100 union and nonunion construction contractors, as well as more than 100 material men and suppliers in construction support industries.  UCANE's member contractors employ citizens of Massachusetts and other New England states.

Together with two construction companies, W. Walsh Company, Inc. ("Walsh"), and I.W. Harding Construction, Inc. ("Harding"), and individual plaintiff Dennis Dugan, UCANE brought suit against the City to challenge the RRO and REO under the Privileges and Immunities Clause of the United States Constitution, which, as I have noted is crafted to protect out-of-state interests from economic (and other) discrimination by state and municipalities. The complaint alleges that Walsh and Harding are Massachusetts corporations that employ non-Worcester residents in sufficient number as to make it infeasible for them to bid on Worcester city projects.  Walsh, it is alleged, employs out-of-state residents; the complaint does not allege the same for Harding.  Dennis Dugan alleges that he is an American citizen and New Hampshire resident

-4-

and submits that the RRO has materially affected his job opportunities.

On December 23, 2002, I granted a preliminary injunction to the plaintiffs, enjoining the City from enforcing the RRO with respect to any public works projects during the pendency of this case.  Utility Contractors Ass'n of New England, Inc. v. City of Worcester, 236 F. Supp. 2d 113, 122 (D. Mass. 2002). Specifically, my findings noted that the plaintiffs established a strong likelihood of success on the merits of their constitutional claim.  The law is clear that a defendant must justify a residency requirement like Worcester's by demonstrating (1) a "substantial reason" for the discrimination and (2) a "close relation" between the discrimination and its purpose.  Id. at 118 (citing Toomer v. Witsell, 334 U.S. 385, 396, 398-99 (1948)); see also id. at 118 n.4 (observing that a government policy that discriminates against out-of-staters is subject to scrutiny nearly as exacting as the "strict scrutiny" applied to content-based speech restrictions and racial classifications).

I found that Worcester's presentation, at the preliminary injunction stage, would not meet these strict legal standards. Worcester presented a compelling and sympathetic portrait of a city in grave economic crisis.  The City described spiraling unemployment and steady decreases in per capita wealth, and amicus curiae filings in support of the RRO buttressed this record.  And indeed, it appeared that an interest in improving

economic conditions in Worcester underlay the City's initial
enactment of the RRO in 1984:

> The city council finds and determines that
> there is unemployment in the city; that the
> subsequent multiplier effect of said
> unemployment in the city has a direct and
> deleterious effect upon all the neighborhoods
> and areas of the city, resulting in
> vandalism, crime, and the physical
> deterioration of neighborhoods and areas;
> that the city expends municipal funds for
> public buildings and public works contracts,
> a large portion of said money being derived
> from taxes paid by city residents; that a
> large portion of workers employed on such
> projects are individuals who do not reside in
> the city of Worcester; and that the jobs
> preference established by this section will
> tend toward the lessening of the deleterious
> effects cited herein.

Rev. Ordinances of the City of Worcester, c. 2, § 32(a).  The
case law, however, did not permit me to recognize Worcester's
economic predicament as an appropriate justification for the
RRO's discrimination against out-of-staters.  Id. at 119-20 &
n.5.

What was more, it did not appear that Worcester had
established the required "close relationship" between its chosen
means -- the RRO - and the end of improving these economic
conditions.  "Eighteen years of the RRO have not resolved the
economic and social conditions that, according to the City,
required its enactment.  Worcester identifies substantially the
same conditions today as the council did in 1984."  Id. at 120.
The RRO, devised for the limited purpose of improving the

competitive position of Worcester residents on public works
projects, lacked the heft required to resolve broader social and
economic issues.  General appeals to the economic conditions of
the City would not justify the RRO's discriminatory purpose and
effect, even recognizing the limited contribution of nonresident
competition to local unemployment.  Id. (citing Opinion of the
Justices to the Senate, 393 Mass. 1201, 1205-06 (1984) (finding
that a justification based on a combination of "critical
unemployment conditions" and nonresident intrusion into local
employment opportunities was insufficient to withstand Privileges
and Immunities scrutiny)).

        The City submits additional material now in hope of
establishing the requisite "close relationship" between the RRO
and its economic ends.  It proffers an affidavit attesting that
the city council effectively suspended the RRO between March 1988
and September 1992.[1]  A second affidavit describes the
consequences of that suspension upon Worcester resident
representation on public works projects in the City.  In June
1991 work began on a project to build a new passenger terminal at
Worcester's airport, and with the RRO inactive, Worcester
residents contributed only 4% of the work hours, and out-of-state
workers contributed 55% of the work hours.  Another affidavit

---

        [1] Specifically, the council considerably narrowed the scope of the
ordinance on March 15, 1988, applying its rigors only to "personnel in
addition to [an employer's] permanent employees."  On September 22, 1992, the
council repealed this amendment, restoring the RRO to full force.

says that the number of Worcester residents employed in construction has increased by only 3.6% since the early 1990s. Finally, the City submits that it has granted waivers of the RRO to more than half the contractors and subcontractors on recent projects.

The parties now bring cross-motions for summary judgment. Distilled to its essence, the plaintiffs' position is that Worcester failed to justify its RRO at the preliminary injunction stage, and it cannot do so now. The City raises a number of defenses; some of these are jurisdictional in nature and appropriately the subject of a Rule 12(b)(1) motion to dismiss. I will therefore treat the City's motion as a motion to dismiss for lack of subject-matter jurisdiction, with additional arguments for summary judgment brought in the alternative.

## II.  **LEGAL ANALYSIS**

### A.  **Standing**

This Court's assessment of its own subject-matter jurisdiction, whether sua sponte or on a defendant's invitation under Federal Rule 12(b)(1), entitles it to examine materials extrinsic to the pleadings and to resolve factual disputes.  See Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 37-38 (1st Cir. 2000); Limone v. United States, __ F. Supp. 2d __, available at 2003 WL 21673651, at *1 n.5 (D. Mass. July 17,

2003).  Unless contested by the defendant, well-pleaded facts in the complaint are to be taken as true in the jurisdictional analysis.  See Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001); 5A Wright & Miller, Federal Practice & Procedure § 1350, at 211-17.

As a result, I am to accept as fact the plaintiffs' averments that Walsh and Harding employ non-Worcester residents in sufficient number as to deter them from bidding on Worcester public works projects.  Likewise, I accept that Walsh employs workers who do not reside in Massachusetts and that Dennis Dugan is a trained engineer, qualified to perform the type of work undertaken on Worcester projects, who resides in New Hampshire.[2] I need not credit the plaintiffs' allegation that the RRO has materially affected Mr. Dugan's job opportunities, as the City challenges that conclusion.

Article III of the United States Constitution affords the federal courts jurisdiction to decide issues only as necessary to resolve a "case or controversy."  Donahue v. City of Boston, 304 F.3d 110, 115 (1st Cir. 2002); Sallen v. Corinthian Licenciamentos LTDA, 273 F.3d 14, 25 (1st Cir. 2001).  To ensure that federal litigants are indeed parties to genuine Article III cases or controversies, a plaintiff must establish the "triad of

---

[2] These facts are not established for summary judgment purposes, as the plaintiffs have submitted no affidavits into the summary judgment record attesting to these details.

injury in fact, causation, and redressability" in support of its

"standing" to sue.  <u>Sallen</u>, 273 F.3d at 25 (quoting <u>Steel Co. v.</u>

<u>Citizens for a Better Env't</u>, 523 U.S. 83, 103-04 (1998))

(internal quotation marks omitted).

     The requirements of standing are set forth in longhand in

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992):

>          First, the plaintiff must have suffered an
>          "injury in fact" -- an invasion of a legally
>          protected interest which is (a) concrete and
>          particularized, and (b) "actual or imminent,
>          not 'conjectural' or 'hypothetical.'"
>          Second, there must be a causal connection
>          between the injury and the conduct complained
>          of -- the injury has to be "fairly . . .
>          trace[able] to the challenged action of the
>          defendant, and not . . . th[e] result [of]
>          the independent action of some third party
>          not before the court."  Third, it must be
>          "likely," as opposed to merely "speculative,"
>          that the injury will be "redressed by a
>          favorable decision."

<u>Id.</u> at 560-61 (citations omitted) (alterations in original).

     The City challenges the standing of each of the plaintiffs

to bring suit.  Specifically, it argues (1) that the Privileges

and Immunities Clause disqualifies corporate plaintiffs from

suit, and (2) the only individual plaintiff in the case, Dennis

Dugan, cannot establish that the City's prospective enforcement

of the RRO poses a harm to him sufficiently imminent as to

warrant the injunctive relief that he seeks.

### 1.   **Corporate Plaintiffs**

     The City contends that UCANE, Walsh, and Harding are not

proper plaintiffs in this case.  The Privileges and Immunities

Clause is clear:  it accords rights to <u>citizens</u>, and the Court has interpreted "citizens" to include only "natural persons, members of the body politic, owing allegiance to the State, not [] artificial persons created by the legislature, and possessing only the attributes which the legislature has prescribed." <u>Paul v. Virginia</u>, 75 U.S. 168, 177 (1868).  The Court has not deviated from this view in the intervening years.  <u>See</u> <u>Metropolitan Life Ins. Co. v. Ward</u>, 470 U.S. 869, 884 (1985); <u>Hemphill v. Orloff</u>, 277 U.S. 537, 548-50 (1928).

But that is only part of the analysis.  The cases that the City cites only affirm the principle that discrimination against out-of-state corporations does not implicate the Privileges and Immunities Clause.  The question here is whether a corporation may bring suit to challenge the City's discrimination against out-of-state "natural persons" on one or both of two theories -- first, on behalf of injured citizens by way of the doctrine of associational standing, and second, in pursuit of their own collateral interests, as corporations claiming injury as a result of the City's allegedly unlawful action.

### a.  <u>Associational Standing</u>

It is clear that a plaintiff need not be an individual citizen to sue and win under the Privileges and Immunities

Clause.   In United States Building & Construction Trades Council
of Camden v. City of Camden, 465 U.S. 208 (1984), the Supreme
Court reviewed and approved the claims of a plaintiff that it
described as "an association of labor organizations representing
private employees in the building and construction trades in
various New Jersey counties." Id. at 212.   Though the Camden
Court performed no standing analysis -- and the issue might well
not have been before it -- the majority opinion took care to note
in support of its jurisdiction that "[t]he Council has at least
some members who reside outside New Jersey." Id. at 212 n.4.
The Third Circuit, performing a more formal standing analysis,
seized on the Camden Court's language to affirm jurisdiction over
a suit brought by a labor union to enforce the rights of some
members under the Privileges and Immunities Clause. See Salem
Blue Collar Workers Ass'n v. City of Salem, 33 F.3d 265, 267-68
(3d Cir. 1994).

     The Camden and Salem cases feature classic applications of
the doctrine of "organizational" or "associational" standing,
which -- notwithstanding the general presumption against third-
party, or "jus tertii," standing -- permits associations to bring
suits to redress injuries to their members. E.g., United Food &
Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S.
544, 551-52 (1996).   Claims of associational standing are
reviewed against a three-part test that the Supreme Court
formulated in Warth v. Seldin, 422 U.S. 490 (1975), and later

revised in Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977).  That test authorizes an associational plaintiff to proceed when (1) its members would have standing to sue in their own right, (2) the suit seeks to vindicate interests that are "germane to the organization's purpose," and (3) the nature of the claim and the relief sought do not require individualized participation.  See United Food & Commercial Workers, 517 U.S. at 553 (citing Hunt, 432 U.S. at 343); see also Conservation Law Foundation of New England v. Reilly, 950 F.2d 38, 41 (1st Cir. 1991).

The plaintiffs have not formally addressed the jurisdictional issues that the City has briefed, but when the City first raised the issue of standing at oral argument on the preliminary injunction, plaintiffs' counsel recited organizational standing principles.  But application of the doctrine to the present case is a bit more problematic than it was in Camden and Salem.  Here the collective plaintiffs are not labor unions, but two construction concerns and a nonprofit association of contractors.  It is a bit of a stretch to characterize the out-of-state workers whose rights are at issue as "members" of the construction companies, and although UCANE is more of an "association" for organizational standing purposes than are Walsh and Harding, the "members" it serves are contractors, not individual laborers.

In <u>White's Place, Inc. v. Glover</u>, 222 F.3d 1327 (11th Cir. 2000), a corporate plaintiff argued that it had associational standing to sue on behalf of its employees' First Amendment rights.  The court found that the plaintiff failed to satisfy the second prong of the <u>Hunt</u> test:  the White's Place concern's primary purpose was "to present exotic dancing for profit" and not to vindicate the speech rights of its workers against undue restrictions.  <u>Id.</u> at 1330 ("[T]he ordinance being challenged here does not directly relate to the interests of the business."); <u>see also</u> <u>Region 8 Forest Purchasers Timber Council v. Alcock</u>, 993 F.2d 800, 810 n.15 (11th Cir. 1993) ("The associational standing test articulated in <u>Hunt</u> is properly reserved for voluntary membership organizations -- like trade associations or environmental groups -- and has no application to a corporation's standing to assert the interests of its employees."); <u>One Thousand Friends of Iowa v. Mineta</u>, 250 F. Supp. 2d 1064, 1068-69 & n.1 (S.D. Ia. 2002) (refusing to recognize a shopping mall as an association for organizational standing purposes).[3]

------------------

[3] <u>But see</u> <u>Overseas Shipholding Group, Inc. v. Skinner</u>, 767 F. Supp. 287, 292 (D.D.C. 1991).  It is apparent that <u>Overseas Shipholding</u>'s is the disfavored view.  No other court has followed it, and the <u>One Thousand Friends of Iowa</u> court rejected it outright.  Wright and Miller observe that associational standing should not be taken too far afield from the prototypical cases -- those involving "representation by environmental, neighborhood, political action, or trade organizations in "traditional forms." 13 Wright & Miller, <u>Federal Practice & Procedure</u>, § 3531.9, at 617 (cautioning that "some forms of association," including corporations, may not warrant the assumption of adequate representation that is made for the more familiar forms").

Clearly, then, Walsh and Harding do not qualify for associational standing.  UCANE, as an association of corporations, lacks standing unless it can be shown that one or more of its member contractors would have standing in their own right.

### b.   Special Relationship/Collateral Harm

It is appropriate to look to another recognized exception to the jus tertii jurisdictional bar:  a plaintiff collaterally harmed by the violation of another's rights can have standing to sue.[4]  See, e.g., Doe v. Bolton, 410 U.S. 179, 188 (holding that statutes criminalizing abortion sufficiently implicated the livelihoods of physicians as to afford them standing to challenge

---

Employees aside, Wright and Miller observe that associational standing principles would not even support a suit by a corporation to assert the rights of its shareholders -- parties certainly better characterized as "members" of the corporate "association" than its hires.  Id.

[4] A third exception to the jus tertii standing bar allows a case to proceed where "practical obstacles" impede the rightsholder's ability to sue on his or her own behalf, provided that the plaintiff can satisfy the court that it will pursue the case competently and zealously on the wronged party's behalf.  See Sec'y of State of Maryland v. Joseph H. Munson Co., 487 U.S. 947, 955 (1984); Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico, 906 F.2d 25, 37 (1st Cir. 1990).  For example, courts allow criminal defendants to assert the rights of potential jurors removed from panels for racially discriminatory reasons.  E.g., Powers v. Ohio, 499 U.S. 400, 413-14 (1991) ("Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom.  A venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character.  The rejected juror may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard.  This congruence of interests makes it necessary and appropriate for the defendant to raise the rights of the juror.").

As there seems to be no practical impediment to an individual plaintiff's lawsuit here -- the City's only jurisdictional quarrel with Mr. Dugan concerns the immediacy of his alleged injury, see infra Section II.A.2 -- I do not believe that the "practical obstacles" exception applies to this case.

them); Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico,
906 F.2d 25, 37 (1st Cir. 1990) ("When a special relationship
exists between the plaintiff and the third party whose rights are
allegedly infringed, so that the infringement of the third
parties' rights restricts the plaintiff's own rights, jus tertii
standing may be appropriate.").  The Doe Court noted, in support
of its jurisdiction over the physicians' claims, that the anti-
abortion statutes "directly operate" against the physicians, even
though the abortion right is lodged in their clients.  The RRO
presents a parallel situation -- it is binding on employers, and
the REO's sanctions accrue to them, notwithstanding that the
implicated right belongs to the employees.

Where the interests of employers and employees significantly
intersect, an employer may bring suit to vindicate the rights of
its hires.  See, e.g., Hang On, Inc. v. City of Arlington, 65
F.3d 1248, 1252 (5th Cir. 1995) (affirming a topless bar's right
to sue to assert the First Amendment rights of its dancers in
part because "the violation of those rights adversely affects the
financial interests or patronage of the business"); Gajon Bar &
Grill, Inc. v. Kelly, 508 F.2d 1317, 1322 (2d Cir. 1974) (same).

The City does not dispute that the Worcester RRO's
discrimination against out-of-state workers impairs the plaintiff
corporations' ability to compete for public works projects in
Worcester.  I find that the alignment of interests between

employer and employee against the Worcester RRO sufficient to establish a genuine Article III case or controversy.

Because Walsh has alleged in the complaint that it employs nonresidents of Massachusetts, it has standing to sue in this case.  Harding has not made such an averment (it only alleges that it employs nonresidents of Worcester) in its pleadings, with the result that it cannot establish standing to sue.  As an association of contractors, some of whom are alleged to be similarly situated to Walsh, UCANE has a derivative ability to sue via associational standing.[5]

### 2.  Dennis Dugan

First, the City objects that the complaint only alleges that Mr. Dugan <u>resides</u> in New Hampshire, and the record gives no indication that Mr. Dugan is a <u>citizen</u> of that state.  While such a distinction may be pertinent to an assessment of diversity jurisdiction, it is of no consequence to a Privileges and Immunities Clause analysis.  See <u>Camden</u>, 465 U.S. at 216 ("We have never read the Clause so literally as to apply it only to distinctions based on state citizenship. . . . [D]espite some initial uncertainty, it is now established that the terms 'citizen' and 'resident' are 'essentially interchangeable,' for

---

[5] It does not aid the City's standing challenge that UCANE, Walsh, and Harding are all incorporated in Massachusetts.  The <u>locus</u> of the right they mean to enforce is <u>in their employees</u>, a number of whom are citizens of other states.  A Massachusetts company that employs out-of-staters can sue under the Privileges and Immunities Clause under these circumstances; a Delaware company whose workers are all Massachusetts residents could not.

purposes of analysis of most cases under the Privileges and
Immunities Clause." (citations omitted)).

The City's second challenge to Mr. Dugan has more bite.  The
record is clear that Mr. Dugan is an out-of-stater and that he is
qualified to work on the type of city construction projects that
are susceptible to the Worcester RRO.  And while Mr. Dugan
attests, in conclusory fashion, that the RRO has impaired his job
opportunities, he fails to spell out how and why it does so.

The "injury-in-fact" need not be, as the City argues, that
Mr. Dugan was denied a work opportunity.  A worker claiming an
equal protection violation can allege "inability to compete on an
equal footing" as his injury-in-fact.  Comfort, 150 F. Supp. 2d
at 295 (quoting Texas v. Lesage, 528 U.S. 18, 21 (1999)).  The
same alleged injury can support standing in a case brought under
the Privileges and Immunities Clause, which is likewise directed
at presumptively unlawful discrimination.

Under Defenders of Wildlife, it cannot be enough that Mr.
Dugan sits in his New Hampshire home, hopes for assignment on a
Worcester public works project, and waits for his phone to ring.
"[T]he mere possibility of future harm, without some compelling
evidence of susceptibility or inevitability, does not satisfy
Article III standing requirements for injunctive relief . . . ."
Comfort v. Lynn School Comm., 150 F. Supp. 2d 285, 288 (D. Mass.
2001); see also Defenders of Wildlife, 504 U.S. at 564 (holding
that a defendant's frustration of a plaintiff's "some day

intentions" cannot, without more, establish the plaintiff's standing to sue for prospective relief).  Mr. Dugan must show a genuine and immediate interest in competing for work on Worcester projects, and not just an eligibility to work on them.

That said, it is difficult to see how an out-of-state worker could show an imminent injury under these circumstances, where contractors, and not their workers, compete for projects.  The RRO has more direct repercussions on contractors than on the workers who are the object of the RRO's discrimination.  I found it adequate that the RRO has deterred Walsh from bidding on Worcester projects.  Some showing that Mr. Dugan works for a contractor similarly deterred is necessary to meet the Defenders of Wildlife standards.

Absent that showing, I am compelled to find that Mr. Dugan has no standing to bring this lawsuit.

**B.   Summary Judgment**

Summary judgment is appropriate when all material facts in the case are undisputed, and on that body of settled fact one party or the other is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  "In assessing a motion for summary judgment, I am required to view the facts in the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor."  Langlois v. Abington Housing Authority, 234 F. Supp. 2d 33, 46 (D. Mass. 2002) (citing Thomas v. Eastman Kodak Co., 183 F.3d 38, 42 (1st

Cir. 1999), and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322
(1986)).

    1.   **<u>Has the City Been Given an Adequate Opportunity to
Develop Its Case?</u>**

    The City protests that the plaintiffs have proceeded
directly to summary judgment practice, affording it no
opportunity to conduct discovery in the case.  It notes that no
scheduling order has even issued.  The City makes a valid point:
courts are to resist the temptation to "swing[] the summary
judgment axe too hastily" -- particularly when the party
resisting summary judgment has not had an opportunity to develop
its case.  <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d 86,
92 (1st Cir. 1996) (quoting <u>Resolution Trust Corp. v. N. Bridge
Assocs., Inc.</u>, 22 F.3d 1198, 1202-03 (1st Cir. 1994)).  Toward
that end Federal Rule 56(f) encourages them, under these
circumstances, either to deny a summary judgment motion or to
order a continuance while the nonmoving party conducts discovery.
<u>See</u> Fed. R. Civ. P. 56(f).

    Rule 56 does not, however, require that every case proceed
through full, exhaustive discovery.  Once a court has determined
that further discovery will not turn up admissible evidence
sufficient to put a factual dispute before a jury, it may grant
summary judgment notwithstanding the plaintiffs' limited
opportunity to take discovery.  <u>Hershey v. Donaldson, Lufkin &
Jenrette Securities Corp.</u>, 317 F.3d 13, 25 (1st Cir. 2003)

(affirming the trial court's discretionary decision not to allow a Rule 56(f) continuance when the proposed discovery would not turn up evidence that would alter a party's entitlement to judgment as a matter of law); <u>U.S. Steel v. M. Dematteo Constr. Co.</u>, 315 F.3d 43, 53 (1st Cir. 2002) (same).

Cases like these, which assail the constitutionality of a statute, submit more easily to prompt summary judgment review than most.  Put another way, it is difficult to see what discovery the City might conduct of the plaintiffs that would defend its RRO under the Privileges and Immunities Clause. Rather, the "discovery" that the City must undertake in this case concerns the justification for an ordinance that it enacted; such introspection does not occur pursuant to the federal discovery rules and does not require the regimentation of a scheduling order from the Court.  The City's critique of the timing of the plaintiffs' motion, which I read as a request for a Rule 56(f) continuance, is unavailing given the nature of this case.

> **2. <u>Has the City Provided an Adequate Justification for the RRO?</u>**

I held at the preliminary injunction stage that the RRO discriminates against out-of-staters with respect to a fundamental right to employment on public works projects, so implicating the Privileges and Immunities Clause.  <u>Utility Contractors</u>, 236 F. Supp. 2d at 117-18 (citing <u>Camden</u>, 465 U.S.

at 216-17, 221-22).  The City has submitted nothing into the
record that warrants alteration of that position.

The City is entitled, under Supreme Court law, to justify
its RRO; to do so, as I have noted, it must show a "substantial
reason" to support the policy[6] and a "close fit" between the RRO
and its purpose.  Id. (citing Camden, 465 U.S. at 222, Piper, 470
U.S. at 284 n.17, and Toomer, 334 U.S. at 396, 398).  The City's
submission at the preliminary injunction stage, citing the City's
diminished economic standing relative to neighboring communities
inside and outside Massachusetts, was insufficient.  Id. at 119-
21.

The City has augmented the record with material that affords
a clearer picture of economic conditions in Worcester and
suggests that elimination of the RRO will result in significant
erosion of Worcester resident work hours on city construction
projects.  The City's argument, even with these enhancements,
still does not pass muster.  A state or municipality's flagging
economy cannot be the "substantial reason" that the Privileges

---

[6] The parties continue to dispute the appropriate time frame of the
justification that Worcester must provide.  That is, does the law require a
constitutionally acceptable justification for the RRO at the time it was
enacted, a justification for its ongoing enforcement, or both?  Worcester is
correct to focus on the present day.  As I have held, to require only a time-
of-enactment justification would preserve a law from constitutional review
into perpetuity solely because there was a "substantial reason" for it at the
time it was passed.  Utility Contractors, 236 F. Supp. 2d at 118-19.  The
plaintiffs seek prospective relief here, and for those purposes present-day
conditions are not only pertinent, but dispositive.  Though the plaintiffs
invite the Court to consider the adequacy of the City's findings at the time
it enacted the RRO in 1984, I do not find such an inquiry pertinent to the
constitutionality of the RRO nearly twenty years later.

and Immunities Clause requires.  To rule otherwise would give local governments <u>carte blanche</u> to use the heavy hand of the law to adjust the competitive dynamic between in-state and out-of-state interests -- this is the very danger that the Privileges and Immunities Clause is poised to prevent.  <u>See</u> <u>Piper</u>, 470 U.S. at 285 n.18.

The chief deficiency of the City's argument to justify its RRO at the preliminary injunction stage was its failure to demonstrate a close fit between its chosen means and its end. Specifically, the City could not show that nonresidents are a "peculiar source of [the] evil" that the RRO means to combat. <u>Utility Contractors</u>, 236 F. Supp. 2d at 118 (quoting <u>Toomer</u>, 334 U.S. at 396, 398).  This is a failing common to public works residency requirements challenged under the Privileges and Immunities Clause.  <u>See, e.g.</u>, <u>Opinion of the Justices to the Senate</u>, 393 Mass. 1201, 1206 (1984); <u>Utility Contractors Ass'n of New England, Inc. v. City of Lowell</u>, 2001 WL 34059083 (Mass. Super. Ct. Norfolk Cty., Dec. 19, 2001), at *3.  The exclusion of Worcester workers from the City's airport project may demonstrate that out-of-state competition is indeed <u>a</u> source of the evil of a depressed citywide economy.[7]  It does not come close, however, to

---

[7] The City cites, among other sources of "evil," rising property taxes in Worcester.  The plaintiffs, for their part, have argued that compliance with the RRO is costly for contractors; to profit on their contracts with the City, they will have to factor the costs of compliance into their bids.  This drives up the cost of public works funded by the City -- one might argue therefore that the RRO is partly at fault for the City's call for greater tax revenues from its property owners.

establishing that nonresidents comprise the "<u>peculiar</u>" source of that evil, such that they might be expected to bear the brunt of efforts to improve conditions in the city.

Worcester cites the <u>Camden</u> Court's suggestion that some greater deference is due to local governments under the Privileges and Immunities Clause when the challenged practice concerns expenditures of their own funds, as on public works projects. <u>Camden</u>, 465 U.S. at 223.  However, this deference does not rise to the level of a "market-participant exception" that would immunize the City from liability outright.  <u>Id.</u> at 220 ("[T]he fact that Camden is merely setting conditions on its expenditures for goods and services in the marketplace does not preclude the possibility that those conditions violate the Privileges and Immunities Clause.").

The Supreme Judicial Court, in <u>Opinion of the Justices</u>, factored this deference into its advisory opinion on a proposed residency preference that would trigger on official state findings that "critical unemployment conditions exist in an employment area and that employment opportunities for Commonwealth residents 'are decreased due to the employment of nonresidents . . . in that area . . . .'"  <u>Opinion of the Justices</u>, 393 Mass. at 1204 (alterations in original).  The court found nonetheless that such a measure would violate the Privileges and Immunities Clause, because "even if it accepted a combination of 'critical unemployment conditions' and nonresident

impact on employment opportunities as a substantial reason for the discrimination, the proposed residency requirement failed the 'close relationship' test." Utility Contractors, 236 F. Supp. 2d at 120 (describing and citing Opinion of the Justices, 393 Mass. at 1206).

In short, nothing in the City's summary judgment papers warrants a retreat from the position the Court took in its preliminary injunction decision.  The Privileges and Immunities Clause flatly forbids enforcement of the City's RRO against contractors and subcontractors on its public works.

III. **CONCLUSION**

For the reasons set forth above, the plaintiffs' motion for summary judgment [document #34] is **GRANTED IN PART AND DENIED IN PART**, and the City's cross-motion [document #46] is **GRANTED IN PART AND DENIED IN PART.**  The claims of plaintiff Dennis Dugan and I.W. Harding Construction, Inc. are **DISMISSED** for lack of subject-matter jurisdiction.  **JUDGMENT** shall enter for the remaining plaintiffs, Utility Contractors Association of New England, Inc., and W. Walsh Co.

Accordingly, the residency requirement contained in Chapter 2, Section 32 of the Worcester Revised Ordinances is declared

invalid as inconsistent with the requirements of the Privileges and Immunities Clause of the United States Constitution and, derivatively, of 42 U.S.C. § 1983.  **The defendant City of Worcester is permanently enjoined from enforcing the residency requirement.**

The plaintiffs are denied attorney's fees at this time and are ordered to make application for attorney's fees in a separate motion.  That motion shall specify the basis for fees and the amount owed, and the plaintiffs shall proffer affidavits supporting their claims.  This case is **CLOSED.**

**SO ORDERED.**

**Dated: September 16, 2003**             _____/s/_____
                                          **NANCY GERTNER, U.S.D.J.**